| | |
|---|---|
| CHRISTOPHER SMITH, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CADENCE BANK, <br><br> Defendant. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

COMES NOW Plaintiff Christopher Smith ("Plaintiff"), on behalf of the putative Classes, by his undersigned counsel, and for his Class Action Complaint against Defendant Cadence Bank ("Cadence"), alleges upon knowledge as to himself and upon information and belief as to all other matters as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff brings this action on behalf of himself and on behalf of a Class of similarly situated consumers against Defendant Cadence ("Cadence" or "Defendant") arising from Defendant's routine policy and practice of assessing two out-of-network ATM fees ("OON Fees") on out-of-network ATM withdrawals preceded by a balance inquiry, in addition to a third fee assessed by an out of network ATM owner. That is how Plaintiff came to be charged fees constituting an astonishing *40%* on an ATM cash withdrawal amount. In addition, Plaintiff brings this action on behalf of himself and on behalf of a Class of similarly situated consumers against Defendant Cadence ("Cadence" or "Defendant") arising from Defendant's routine policy and practice of charging multiple fees on the same item.

2.     Cadence's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation Cadence's contractual commitments.

3.     Plaintiff and other Cadence customers have been injured by Cadence's practices. On behalf of himself and the putative class, Plaintiff seeks damages and restitution for Cadence's breach of contract.

## PARTIES

4.     Plaintiff Christopher Smith is a resident and a citizen of Tennessee.

5.     Defendant Cadence is a bank with over $50 billion dollars in assets. It is headquartered in Tupelo, Mississippi and Houston, Texas.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

   a.   the proposed Classes are comprised of at least 100 members; § 1332(d)(5)(B)

   b.   at least one member of the proposed class is a citizen of a State other than Texas (the State of which Cadence is a citizen), § 1332(d)(2)(A); and

   c.   the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. § 1332(d)(2), (6).

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Cadence is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

## I.    ATM CLAIM: THREE FEES FOR CASH WITHDRAWALS UNDERTAKEN WITH A BALANCE INQUIRY

8.     A Cadence accountholder who unsuspectingly checks the account balance as part of a cash withdrawal at an out of network ATM machine is assessed the following fees: 1) the customer will pay the ATM operator and/or network a surcharge for the withdrawal; 2) the customer also pays Cadence an OON Fee; 3) and the customer will also pay Cadence *another* OON Fee for supposedly undertaking one or more balance inquiries during the cash withdrawal. So, a single $20.00 withdrawal can generate between $4.00 and $8.00 in fees, including two separate fees to Cadence.

9.     Because the provision of balance inquiries are essentially cost-free to ATM owners, and because they are hugely profitable, ATM owners have placed a great emphasis in recent years on increasing the number of supposed balance inquiries undertaken at their machines—by any means necessary.

10.     In the last decade, the revolution of mobile banking applications and increasing legislative scrutiny on the punitive nature of independent ATM machine withdrawal surcharges has forced the ATM operators to seek other sources of revenue. The 2015 Independent ATM deployer survey sponsored by Kahuna ATM Solutions and the ATM Industry Association found that declining interchange rates were one of the top concerns for Independent ATM operators.[1] For example, one of the largest ATM operators repeatedly voiced this concern in its financial disclosures, stating:

> In addition to the impact of the net interchange rate decrease, we saw certain financial institutions migrate their volume away from some networks to take advantage of the lower pricing offered by other networks, resulting in lower net interchange rates per transaction to us. If financial institutions move to take further

---

(i)     [1] *See* 2015 IAD Poll at https://www.atmmarketplace.com/news/2015-iad-poll-reveals-growing-attention-on-emv-shrinking-focus-on-mobile/ (Last Viewed June 11, 2020).

advantage of lower interchange rates, or if networks reduce the interchange rates they currently pay to ATM deployers or increase their network fees, our future revenues and gross profits could be negatively impacted.

*See* Cardtronics plc SEC Form 10-Q, filed May 3, 2018, p. 46 (available at https://www.sec.gov/Archives/edgar/data/1671013/000155837018003893/catm-20180331x10q.htm).

11.     Feeling the financial pressure of declining interchange rates, the ATM operators sought to increase revenue in other ways.

12.     They turned to balance inquiries to drive revenue. But they had a problem: very few consumers seek them out and are willing to pay for them.

13.     Consumers, in short, use ATMs for the service of withdrawing cash, not to perform balance inquiries and transfers that are now commonly performed online or on mobile devices for free. As such, ATM operators and financial institutions have known for years that the overwhelming majority of customers who come to use their ATM machines are there to perform **only** a cash withdrawal.

14.     This makes sense. Due to the availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access—all of which are free—*paying* for a balance inquiry at an ATM would be, in almost every instance, completely irrational. Moreover, the shelf-life of the information obtained through a balance inquiry is extremely short. With checking accounts having numerous transactions that post throughout the day, as well as scheduled withdrawals that occur overnight, the viability of the information received through a balance inquiry at an ATM is only even arguably beneficial for the immediate business at hand, ***i.e. the cash withdrawal***.

15.     Moreover, because consumers are entitled to receive, as part of their cash

withdrawal, a printed receipt at the conclusion of their transaction, they already have free access to their account balances without having to engage in a separate balance inquiry.

16.     Therefore, when a consumer uses an ATM for a balance inquiry, it is almost always *in conjunction* with a cash withdrawal transaction.

17.     For all these reasons, historically only a tiny percentage of ATM transactions were for balance inquiries.  Very few consumers need this information urgently enough to pay for it.

18.     But ATM operators had a solution: lure consumers into balance inquiries via trickery and deception in order to increase balance inquiries from those customers who otherwise do not need them or would not be willing to pay for them as part of a cash withdrawal. The ATM operators have embraced a number of tactics to increase the number of balance inquiries supposedly performed at their ATM machines.

19.     When consumers use ATMs not owned by their own financial institution, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

20.     That message appears only after a user has decided to perform a cash withdrawal and entered the amount of cash he would like to withdraw.

21.     Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.  But there is no warning whatsoever at an ATM that any form of balance inquiry could be an event worthy of a fee, either from the ATM owner or from the consumer's financial institution.

22.     Without such a notice, a balance inquiry appears to be nothing more than an

unremarkable, free lead-in to a cash withdrawal to reasonable, diligent consumers.

23. Second, many ATM operators use intentionally deceptive on-screen prompts to exploit and add to the consumer confusion resulting from a lack of an on-screen fee notice. While varying in certain ways, the intention and effect is the same: to trick consumers into repeatedly paying more for a single ATM usage by increasing purported balance inquiries.

**A. Overview of Claim**

24. Cadence's Account Documents misrepresent to accountholders the true nature of Cadence's assessment of these fees, never stating Cadence's true policy to assess two separate OON Fees for the same ATM use. Cadence's contract terms mislead accountholders to believe that a balance inquiry undertaken as part of a cash withdrawal will be assessed a single OON Fee by Cadence.

25. Cadence's uniform practice of charging two OON Fees per cash withdrawal preceded by a balance inquiry on top of the fee charged by the out-of-network ATM operator violates representations in Cadence's account documents, and constitutes a breach of contract and breach of the covenant of good faith and fair dealing. Indeed, Cadence's account documents misrepresent the possibility of being charged two fees by Cadence during one transaction at an out of network ATM.

26. Consumers like Plaintiff simply do not know they can be assessed *three discrete fees for a simple out of network ATM session that lasts less than two minutes.* Cadence, along with the ATM owners, is all too happy to keep consumers in the dark.

27. Cadence's account documents do not represent that consumers will be subject to the triple OON Fees for an out-of-network ATM withdrawal preceded by a balance inquiry.

28. When consumers use ATMs not owned by their own financial institution, federal

law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

29.     Thus, it is standard at ATMs in the United States that when a consumer uses an ATM not owned by the consumer's home financial institution, a message is displayed on the screen stating that usage of the ATM will cost a specified amount to proceed with a withdrawal of funds, and that such a fee is in addition to a fee that may be assessed by a consumer's financial institution for use of the ATM. *See supra*.

30.     Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.

31.     Cadence knows this—that consumers expect a fair fee disclosure at the ATM—and has exploited consumers' reasonable expectation that they will only engage in fee-worthy actions knowingly and with appropriate disclosures—and will be provided a warning and an opportunity to cancel actions before being assessed a fee.

32.     Reasonable consumers like the Plaintiff do not, in sum, understand a balance inquiry to be an independent transaction worthy of a separate fee.

33.     Cadence knows this—that in the absence of a prominent warning otherwise, consumers expect a balance inquiry to be an integral, included part of a cash withdrawal.

34.     Cadence has designed a scheme to assess OON Fees on those purported balance inquiries.   Cadence preys on the common sense that a balance inquiry preceded by a cash withdrawal is not an independent and separate basis for a separate OON Fee.

35.     If a financial institution is going to charge such a conscience-shocking fee, its

contract with its members must allow for fully and fairly disclose such a fee. Cadence did the opposite—providing express and implied indications that balance inquiries undertaken in conjunction with cash withdrawals would <u>not</u> incur additional OON Fees..

**B.    Account Disclosures**

36.    Against the backdrop of the reasonable consumer expectations and federal law above, Cadence's disclosures reinforce the reasonable understanding that no fee will be assessed for a balance inquiry—especially if ATM users are not warned beforehand. The Account Documents state:

> Non-Cadence Bank ATM Withdrawal or Inquiry*............................................................ $2
>
> …
>
> *Fees charged by machine owner may also apply.

37.    Based on this disclosure, ATM users would have no reason to believe that a balance inquiry undertaken with a cash withdrawal will result in two separate OON Fees because it is all a single episode of  usage.

38.    Accountholders using non-Cadence ATMs are never warned that they will receive **two separate fees** from Cadence—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.  But that is exactly what happens.

39.    The most reasonable understanding of this disclosure is that a single fee will be assessed whether a consumer does a cash withdrawal or balance inquiry, or both.

40.    When a balance inquiry precedes a withdrawal, common sense and consumer expectation dictate that that two-step process is part of the same ATM use.

41.    In general, and in Plaintiff's case here, the ATM owner does not warn the user that

there is a separate charge for a balance inquiry, and in fact the ATM owner does not charge a separate fee to the user for a balance inquiry. Therefore, the user can have no reasonable expectation that Cadence will assess a fee for an action that the ATM owner does not charge or warn about.

42. Cadence accountholders using a non-Cadence ATM are never warned that they will receive two separate fees from Cadence—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.

43. At the very least, Cadence uses contractual discretion in bad faith when it assesses two OON Fees during the same ATM use when a balance inquiry immediately precedes a cash withdrawal.

### C. **Plaintiff's Out of Network ATM Balance Inquiry Transactions**

44. On April 17, 2023, Plaintiff placed his Cadence debit card into an out of network ATM in Lakeland, TN in order to make a $20 cash withdrawal. The ATM owner charged a $4 fee for using the ATM. Cadence later issued account statements showing he was assessed, in addition to the $4 fee paid to the ATM operator, *two separate $2 fees* from Cadence for making an out-of-network balance inquiry, and an additional fee from Cadence for making an out-of-network cash withdrawal. In all, Plaintiff was charged $8 in fees to withdraw $20 in cash.

## II. DEFENDANT ASSESSES TWO OR MORE FEES ON THE SAME ITEM RETURNED FOR INSUFFICIENT FUNDS

45. Defendant unlawfully maximizes its already profitable fees through the deceptive and, upon information and belief, the contractually-prohibited practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, on an item.

46. Unbeknownst to consumers, when Defendant reprocesses an electronic payment item, ACH item, or check for payment after it was initially rejected for insufficient funds,

Defendant chooses to treat it as a new and unique item that is subject to yet another fee. But Defendant's contract never states that this counterintuitive and deceptive result could be possible and, in fact, promises the opposite.

47.     The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313.

48.     This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if an item is reprocessed for payment multiple times.

49.     Upon information and belief, the contract allows Defendant to take certain steps when paying a check, electronic payment item, or ACH item when the accountholder does not have sufficient funds to cover it. Specifically, Defendant may (a) pay the item and charge a $30 fee; or (b) reject the item and charge a $30 fee.

50.     In contrast to the Contract, however, Defendant regularly assesses two or more $30 fees on an item.

**A.     The Imposition of Multiple Fees on a Single Item Violates Defendant's Express Promises and Representations**

51.     Defendant's contract promises that a single fee will be assessed on an item:

If a Transaction is presented to the Bank and the Bank refuses to honor the Transaction because there are insufficient funds to pay the Transaction, your Account will be assessed a fee as set forth in the current fee schedule for returning the item unpaid.

Ex. A, p. 18.

52.     The same item on an account cannot conceivably become a new one when it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

53.     There is zero indication anywhere in the contract that the same item is eligible to incur multiple fees.

54.     Even if Defendant reprocesses an instruction for payment, it is still the same item. Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

55.     The contract never discusses a circumstance where Defendant may assess multiple fees for a single check, electronic payment item, or ACH item that was returned for insufficient funds and later reprocessed one or more times and returned again.

56.     In sum, Defendant promises that one fee will be assessed on an item, and this term must mean all iterations of the same instruction for payment. As such, Defendant breached the contract when it charged more than one fee per item.

57.     Reasonable consumers understand any given authorization for payment to be one, singular "item."

58.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same item will be treated as the same "item," which Defendant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Upon information and belief, nowhere do Defendant and its customers agree that Defendant will treat each reprocessing of a check, electronic payment item, or ACH item as a separate item, subject to additional fees.

59. Customers reasonably understand that Defendant's reprocessing of checks, electronic payment items, and ACH items are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger fees. In other words, it is always the same item.

60. Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something, upon information and belief, Defendant here did not do.

61. Community Bank, NA, discloses its fee practice in its online banking agreement, in all capital letters, as follows:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. **You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.**

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank N.A. 5 (Nov. 12, 2019), https://bit.ly/3uQafe7 (emphasis added).

62. Defendant's contract provides no such authorization, and actually promises the opposite— Defendant may charge, at most, a fee, per item.

**B.    Plaintiff's Experience**

63. In support of Plaintiff's claim, Plaintiff offers an example of fees that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

64. In January of 2022, Plaintiff was assessed multiple fees on an item.

65. Plaintiff understood the payment to be a single item as is laid out in the contract, upon information and belief, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

## III. THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

66.     Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

67.     Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers, Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

68.     Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

69.     It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

70.    When Defendant charges improper fees in this way, upon information and belief, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ALLEGATIONS

71.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

ATM Fee Class: All Cadence checking account holders who, during the applicable statute of limitations, were assessed two (or more) OON Fees when they performed a balance inquiry prior to withdrawing cash at an out-of-network ATM.

Multiple Fee Class: All Cadence checking account holders who, during the applicable statute of limitations, were assessed multiple fees on an item on a Defendant checking account.

72.    Excluded from the Classes are Cadence, its parents, subsidiaries, affiliates, officers and directors, any entity in which Cadence has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

73.    The members of the Classes are so numerous that joinder is impractical.  The Classes consist of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained only by resort to, Cadence's records.

74.    The claims of the representative Plaintiff are typical of the claims of the Classes he seeks to represent in that the representative Plaintiff, like all members of the Classes, were charged improper and deceptive fees as alleged herein. The representative Plaintiff, like all members of the Classes, were damaged by Cadence's misconduct in that they were assessed two or more OON

Fees when they performed a balance inquiry prior to withdrawing cash at an out-of-network ATM and multiple fees on the same item. Furthermore, the factual basis of Cadence's misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes. And Cadence has no unique defenses that would apply to Plaintiff and not the Classes.

75.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

76.     The questions of law and fact common to the Classes include, but are not limited to, the following:

a.     Whether Cadence's assessment of two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM was in breach of its contract;

b.     Whether Cadence's assessment of multiple fees on the same item was in breach of its contract;

c.     The proper method or methods by which to measure damages and/or restitution and/or disgorgement; and

d.     Whether Plaintiff and the Classes are entitled to declaratory and injunctive relief and the nature of that relief.

77.     Plaintiff's claims are typical of the claims of other members of the Classes, in that they arise out of the same wrongful OON Fee and multiple fee policies and practices. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Classes.

78.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, consumer class actions against financial institutions.  Accordingly, Plaintiff is an adequate representatives and will fairly and adequately protect the interests of the Classes.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual member of the Classes' claims is small relative to the complexity of the litigation, and due to the financial resources of Cadence, no member of the Classes could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the members of the Classes will continue to suffer losses and Cadence's misconduct will proceed without remedy.

80.     Even if members of the Classes themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

81.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

82.     Cadence has acted or refused to act on grounds generally applicable to each of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Classes as a whole.

83. All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**On Behalf of Plaintiff and the Classes**

84. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85. Plaintiff and Cadence have contracted for bank account deposit, checking, ATM, and debit card services. That contract does not permit Cadence to charge two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM or multiple fees on the same item. Nowhere in the Account Agreement did Cadence state that it would charge two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM. Good faith is an element of every contract or multiple fees on the same item. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of

imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

87.     Cadence has breached the covenant of good faith and fair dealing in its account agreement with customers by charging two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM.

88.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

89.     Plaintiff and members of the Classes have sustained damages as a result of Cadence's breach of the contract.

**SECOND CAUSE OF ACTION**
**Violation of the Tennessee Consumer Protection Act**
**On Behalf of Plaintiff Individually**

90.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.     Plaintiff is a consumer as defined by the Tennessee Consumer Protection Act, Tennessee Code § 47-18-103 ("TCPA").

92.     Defendant committed the unfair and deceptive acts in the conduct of trade or commerce as described herein by advertising goods or services with intent not to sell them as advertised and representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law.

93.     Defendant continues to commit the unlawful violations described herein.

94.     Defendant is liable to Plaintiff for damages, penalties, and attorneys fees under the TCPA.

## **THIRD CAUSE OF ACTION**
### **Violation of the Texas Deceptive Trade Practices**
### **On Behalf of Plaintiff and the Classes**

95.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

96.    Plaintiff is a "consumer" as defined in the DTPA.

97.    Defendant violated the following provisions of the DTPA;

      a.    §17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in §17.46(b)(5), §17.46(b)(7), §17.46(b)(12), §17.46(b)(20), and §17.46(b)(24) of the DTPA that were detrimentally relied upon by Plaintiff;

      b.    §17.50(2): breach of express warranty, as defined in §2.313 of the Texas Business and Commerce Code;

      c.    §17.50(3): an unconscionable action or course of action as defined by §17.45(5).

98.    Plaintiff further contends that Defendant's violations of the DTPA were committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of the DTPA.

99.    This conduct was a producing and/or proximate cause of actual damages to Plaintiff, as set forth herein.

100.    Pursuant to Tex. Bus. & Com. Code § 17.505, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of the DTPA and demanded

that it both rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to respond to Plaintiff's letter or fails to agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within sixty days of the date of written notice, as proscribed by section 17.505, Plaintiff will move to amend her Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate, against Defendant. However, as to this cause of action, at this time, Plaintiff seek only injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Classes seek an Order:

1.      Certifying the proposed Classes pursuant to Rule 23;

2.      Declaring that Cadence is financially responsible for notifying the Class members of the pendency of this suit;

3.      Declaring the Cadence has committed the violations of law alleged herein;

4.      Providing for any and all injunctive relief the Court deems appropriate;

5.      Awarding statutory damages in the maximum amount for which the law provides;

6.      Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

7.      Providing for any and all equitable monetary relief the Court deems appropriate;

8.      Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

9.      Awarding Plaintiff their reasonable costs and expenses of suit, including attorneys'

fees;

10.       Awarding pre- and post-judgment interest to the extent the law allows; and

11.       Providing such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues so triable.

Date: April 9, 2024                        Respectfully submitted,

By: */s/ Andrew Shamis*
Andrew Shamis
Texas Bar No. 24124558
Edwin E. Elliott (pro hac vice forthcoming)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
(305) 479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jacob Phillips (pro hac vice forthcoming)
Joshua Jacobson (pro hac vice forthcoming)
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
(407) 720-4057
jacob@jacobsonphillips.com
joshua@jacobsonphillips.com

Jeffrey D. Kaliel (pro hac vice forthcoming)
Sophia G. Gold (pro hac vice forthcoming)
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
(202) 350-4783
jkaliel@kalielgold.com
sgold@kalielgold.com

Scott Edelsberg (pro hac vice forthcoming)
**EDELSBERG LAW, P.A.**
1925 Century Park East, Suite 1700
Los Angeles, California 90067

Telephone: (305) 975-3320
scott@edelsberglaw.com

*Counsel for Plaintiff and the Proposed Class*